CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

AUG 22 2023

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

Joe B.,[1]                            )
    Plaintiff,          )          Civil Action No. 4:22-cv-00099
         )
v.                                    )          REPORT & RECOMMENDATION
         )
Kilolo Kijakazi,                      )          By: Joel C. Hoppe
Acting Commissioner of Social Security,)             United States Magistrate Judge
    Defendant.          )

   Plaintiff Joe B. asks this Court to review the Acting Commissioner of Social Security's

("Commissioner") final decision denying his application for disability insurance benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is before me

by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the

parties' briefs, and the applicable law, I cannot find that the Commissioner's final decision is

supported by substantial evidence. Accordingly, I respectfully recommend that the presiding

District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C.

§ 405(g).

I. Standard of Review

   The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or

equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4).[2] The claimant bears the burden

of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

Joe filed for DIB in August 2020. *See* Administrative Record ("R.") 235–41. He alleged

he became disabled on November 15, 2019, R. 235, from degenerative disc disease,

spondylolisthesis at L5-S1, herniated lumbar disc without myelopathy, significant lumbar

spondylolysis L3-S1, hearing loss, high blood pressure, lack of balance and grip strength,

shortness of breath, trouble sleeping, and tingling, R. 101. Joe was 49 years old at his alleged

onset date, or a "younger person" under the regulations.[3] 20 C.F.R. § 404.1563(c). Disability

Determination Services ("DDS"), the state agency, denied his claim initially in November 2020,

R. 100–08, and upon reconsideration in April 2021, R. 109–20. On October 6, 2021, Joe

appeared with a non-attorney representative and testified at an administrative hearing before ALJ

Brian Rippel. *See* R. 46–78. A vocational expert ("VE") also testified at this hearing. R. 69–78.

ALJ Rippel issued an unfavorable decision on October 18, 2021. R. 23–39. First, he

found that Joe had not engaged in substantial gainful activity since November 15, 2019. R. 26.

At step two, the ALJ found that Joe had severe medically determinable impairments of "spine

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[3] Joe's alleged onset date for this DIB claim is one day after ALJ Mark Baker issued a written decision denying Joe's previous DIB claim, R. 82–90 (Nov. 14, 2019). *See* R. 268.

impairment (lumbar degenerative disc disease (DDD) and spondylosis with disc bulging, mild

stenosis, and facet arthropathy), left leg lumbar radiculopathy, bilateral hearing loss, and inguinal

hernia." *Id.* Joe's other medical conditions did not have more than a minimal effect on his

functional abilities during the relevant period, and, thus, were not severe impairments. *Id.* Joe's

severe impairments did not meet or medically equal the relevant Listings. *See* R. 28–30 (citing

20 C.F.R. pt. 404 subpt. P, app. 1 §§ 1.16, 1.18, 2.10, 5.00). The ALJ then determined that Joe

had the residual functional capacity ("RFC") to do "light" work[4] with additional restrictions:

> only occasional pushing and/or pulling (including foot control operations) with the
> bilateral lower extremities; must be able to alternate between sitting and standing
> while remaining on task at 20-30 minute intervals; limited to only frequent
> balancing; . . . only occasional climbing ramps or stairs, stooping, kneeling,
> crouching, crawling; no climbing ladders, ropes, or scaffolds; [and] only occasional
> exposure to extreme cold or vibration; no exposure to workplace hazards (including
> unprotected heights and dangerous machinery) . . . .

R. 31. This RFC ruled out Joe returning to his past relevant work as a mail carrier. R. 37. Relying

on the VE's testimony, however, ALJ Rippel found that this RFC would have allowed Joe to

perform certain unskilled "light" occupations (assembler, price marker, office helper) that

offered a significant number of jobs in the national economy. R. 38, 71–72. Accordingly, the

ALJ found that Joe was not disabled during the relevant period. R. 39. The Appeals Council

denied Joe's request to review the ALJ's decision, R. 1–7, and this appeal followed.

## III. Discussion

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these strength
demands can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to
six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'"
*Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20
C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983) ALJ Rippel found that Joe
could lift/carry "up to 20 pounds occasionally and 10 pounds frequently and "stand[] and/or walk[] up to
6 hours and sit[] up to 6 hours in an 8-hour workday," but needed a sit-stand option "at 20-30 minute
intervals" while remaining on task. R. 31.

Joe challenges the Commissioner's denial of benefits on two grounds. First, he argues that ALJ Rippel's "assessment of [Joe's] physical impairments and RFC findings [were] not supported by substantial evidence." Pl.'s Br. 15, ECF No. 15. Specifically, Joe argues that the ALJ "failed to build a logical bridge between the evidence and his RFC findings and failed to explain how his RFC findings actually address[ed] or accommodate[d] [Joe's] severe impairments," *id.* at 17 (citing R. 32–33), by not adequately addressing the opinions of Dr. Roy and Dr. Ostergard, *id.* at 17–20, and by "cherry pick[ing]" the evidence and ignor[ing] significant evidence contrary to his findings," *id.* at 20. Second, ALJ Rippel's "assessment of [Joe's] allegations [was] not supported by substantial evidence." *Id.* at 23. Joe notes that "the ALJ cites numerous exhibits with no reference to the actual evidence therein," *id.* at 24, he and argues that the ALJ improperly considered his activities of daily living, treatment, and compliance with treatment, *id.* at 24–27. I find both arguments to be persuasive.

*A.    Summary*

   *1.    Treatment Records*

   Joe worked for many years as a mail carrier. He ultimately had to retire because of his medical condition. R. 480; *see* R. 403. In February 2019, Joe saw Mark Roy, M.D., at UNC Neurosurgery. R. 403. Dr. Roy noted that Joe "ha[d] been having a lot of weather related back pain over the past few months" but on "confrontational testing his strength [was] full." R. 405. Regarding his lumbar spondylosis, Dr. Roy found that Joe was stable and refilled his prescriptions. R. 404. Joe was taking cyclobenzaprine "as needed for muscle spasms" and hydrocodone-acetaminophen "as needed for pain." *Id.* At a follow-up appointment in May 2019, Dr. Roy noted that Joe was doing "reasonably well" and "ha[d] a little strain of his back from picking up some shredding material." R. 407. Joe's strength remained full on confrontational

testing, and Dr. Roy again found that his lumbar spondylosis was "stable" and planned to see

him "every few months." R. 409. During an appointment in August 2019, Joe reported having

"aggravated his back a little bit," R. 411, but to "confrontational testing his strength [was] full,"

R. 413; *see also* R. 563 (normal physical exam in July 2019). Dr. Roy "suspected [Joe] w[ould]

have intermittent back pain and [] ha[d] already severely limited his lifting. If this bec[ame] more

chronic [he] would probably reimage him with an eye toward intervention." R. 413. In

November 2019, Joe had "low back pain," which started earlier that month "after waxing his

car." R. 418. "He [had] been using hydrocodone and ice[,] and it seem[ed] to be slowly

improving." *Id.* Dr. Roy noted that Joe had "severe limitation in his lifting abilities." R. 420.

In February 2020, Joe reported "persistent activity related back pain." R. 380. He was

"applying for disability," which Dr. Roy supported. *Id.*; *see also* R. 420 (Nov. 2019). On general

examination, his strength "was full," but Dr. Roy "recall[ed] from his MRI he ha[d] significant

degenerative change" at L3-4, L4-5, and L5-S1. R. 383. Regarding Joe's lumbar spondylosis, Dr.

Roy "was not sure that operative intervention would make a significant difference in his ability

to lift or bend" and opined that "leaving this alone probably ma[de] the most sense." *Id.* At a

follow-up appointment in March 2020, Dr. Roy noted that Joe was "doing reasonably well" and

opined that "not working [was] agreeing with him." R. 385. Dr. Roy assessed that Joe's lumbar

spondylosis was "stable" at the time of this appointment. R. 387.

In April 2020, Joe began seeing Thomas A. Ostergard, M.D., at Carolina Neurosurgery

and Spine Associates. R. 500 (telehealth visit). He reported a six-year history of back pain that

"significantly worse[ned] with activity," particularly "bending, lifting twisting, [and] lifting

greater than 5 lb[s]." *Id.* Joe's pain "required him to retire from the postal service." *Id.* Dr.

Ostergard reviewed the MRI of the lumbar spine and found "diffuse spondylosis with disc

6

bulging at L2-3, L3-4, and L4-5 but no clinically significant areas of neural foraminal or central canal stenosis." R. 501. He was "[s]uspicious that [Joe] may have a different cause for his pain than the degenerative disease in the spine . . . . potentially sacroiliac inflammation on the left." *Id.* Dr. Ostergard recommended steroid injections for Joe's pain, along with having him evaluated "for trial of a spinal cord stimulator." *Id.* Joe followed up in person with Dr. Ostergard in July 2020 to discuss his low-back and leg pain. R. 493. Joe's physical exam was normal, apart from having "reduced [and] painful" hip rotation. R. 494–96; *see also* R. 543 (normal physical exam in July 2020). Dr. Ostergard diagnosed three separate problems: back pain; left testicular pain; and left hip pain. R. 496–97. Dr. Ostergard noted that these problems "may [or] may not be related to each other." R. 496. In particular, he did not think that Joe's testicular pain was "consistent with a left L2 radicular distribution." *Id.* He also opined that the left hip pathology was "likely exacerbating any underlying back issues," as Joe walked with a limp on that side and could not bear weight on that leg. R. 497. Dr. Ostergard recommended hip injection to address the pain. *Id.*

In July 2020, Joe was evaluated by Sarah Desai, PAC. R. 480. He again reported "a six year history of low back pain with radiation down into his lower extremities . . . through the buttocks on both sides and down into the left lower extremity," with occasional "symptoms in the right side as well." *Id.* Joe described the pain as a "sharp, burning, deep sensation," located primarily in the "lower back itself," but also in the "left SI joint radiating down through the left leg and thigh." *Id.* Joe also had "numbness and tingling in both his feet." *Id.* PAC Desai noted that Joe "ha[d] good strength in his lower extremities," but was "tender to palpation across his lumbar spine out into the left flank" and "ha[d] a trigger point over the left SI joint that [was] very painful." *Id.* ("When I press on [the trigger point] the patient almost collapse[s]. It is

7

isolated to a very specific area."). Joe had "normal" gait and station, "normal" upper and lower

extremity coordination on both sides, and "normal" upper and lower extremity muscle strength

and tone on both sides. R. 483. His lumbar spine motion was "with pain" and his range of motion

was "moderate, decreased." *Id.* Joe was given a trigger point injection at the SI joint. R. 486.

At a follow up in August 2020, Joe reported "having some pain that radiate[d] into his

left testicle." R. 477 (telehealth visit). Dr. Ostergard reviewed the MRI of Joe's lumbar spine and

found an "extraforaminal disc herniation that contact[ed] and displace[d] the left L2 exiting

nerve root." R. 478. Because Joe's "symptoms ha[d] not improved with nonsurgical

management," Dr. Ostergard "recommended surgical intervention," which "would involve a left

L2-3 far lateral minimally invasive microdisc[]ectomy." *Id.* He noted that Joe was "going to

consider surgery, as he [was] a bit anxious regarding being in [a] health care facility during the

COVID pandemic." *Id.* At a follow up in December 2020, Joe "ha[d] not had any re-

exacerbations of his low back or left lower extremity radicular pain. Overall it ha[d] been

improving with no new complaints." R. 585.

In April 2021, Joe reported "two periods of significant exacerbation with severe pain

radiating from the back into the left groin, still in a left L2 distribution." R. 639. "These episodes

slowly subsided over [a] few weeks, but were still quite painful and [were] exacerbated by any

time he trie[d] to advance his level of activity past minimal." *Id.* His physical exam was normal.

R. 641–42. Dr. Ostergard opined that Joe's symptoms were "getting worse and will eventually

require operative intervention," but Joe wanted to "wait until absolutely necessary" even though

surgery would be "minimally invasive." R. 642. A lumbar MRI taken in June 2021 showed

"slight progression of mild central and mild to moderate bilateral foraminal narrowing at L3-4,"

as well as "mild" to "moderate" abnormalities from L2-3 to L5-S1. R. 678. His physical exam

was normal except for "decreased" sensation at L2-L3. *See* R. 673–74. In July 2021, Joe's back symptoms were "stable," and "[h]is severe radicular pain ha[d] thankfully improved some." R. 668. However, Joe still had "numbness and paresthesias in the same distribution." *Id.* Dr. Ostergard discussed Joe's "long-term prospects" of returning to work and found that "[g]iven the nature of his back symptoms and the significant pain he ha[d] when he trie[d] to increase his activities to normal activities of daily living, unfortunately [Dr. Ostergard] d[id] not think that [Joe] w[ould] likely be able to return to work without severe, debilitating pain. His degenerative disease certainly w[ould] not get better as he continue[d] to age[;] if anything it w[ould] stay severe or worsen." R. 670. Because Joe's current symptoms had improved, Dr. Ostergard thought his symptoms could be monitored and treated without surgery for the time being. *Id.*

### 2. Medical Opinions

On January 13, 2019, Dr. Roy submitted a letter supporting Joe's prior DIB claim. *See* R. 87, 346. Dr. Roy treated Joe for degenerative disc disease of the lumbar spine and noted that Joe had "numerous episodes of incapacitation with this." R. 346. At the time, Joe was stable, but was "unable to function in his job because of severe limitations with lifting and bending." *Id.* Dr. Roy also noted that Joe's "medical condition ha[d] not changed and [he] did not anticipate him being able to return to work for the foreseeable future." *Id.*

In February 2020, Dr. Roy filled out an evaluation form on Joe's limitations attributable to lumbar spondylosis. R. 347–48. Dr. Roy opined that Joe could work 1 hour per day, stand for 15 minutes at one time, stand for 60 minutes during the workday, sit for 15 minutes at one time, sit for 60 minutes during the workday, and occasionally lift 5 pounds, but could not lift any amount of weight on a "frequent" basis, and never bend, stoop, or balance. R. 347–48. Finally, Dr. Roy opined that Joe suffered from "severe" pain. R. 348.

William Rutherford, M.D., reviewed Joe's records for DDS in November 2020. R. 101–

08. Dr. Rutherford opined that Joe had primary "severe" disorders of back (discogenic and

degenerative); secondary "severe" other and unspecified arthropathies; and "non-severe" hearing

loss, essential hypertension, and hernias. R. 104–05. Dr. Rutherford opined that Joe could

perform "light" work, R. 108, meaning he could stand or walk for six hours and sit for six hours

in an eight-hour workday and could "occasionally" lift twenty pounds and "frequently" lift ten

pounds, with some postural limitations, *see* R. 106–07. He reasoned that Joe "ha[d] not had prior

spinal surgery," and while "[h]is provider has recommend surgical intervention . . . nothing has

been scheduled due to COVID precautions and [Joe's] financial issues." R. 106. Additionally,

Joe's "neurosurgery exams consistently note[d] normal gait, normal heel and toe walking,

normal coordination, no acute distress, [and] normal strength and sensation in [bilateral upper

and lower extremities]." *Id.* Dr. Rutherford noted Joe's "painful and decreased [range of motion]

in lumbar," as well as "SI joint inflammation and inguinal hernia which add[ed] to his pain.

However, given that [Joe] ha[d] full strength and sensation in [bilateral lower extremities] as

well as normal gait, [a] light RFC appear[ed] appropriate." *Id.* On reconsideration review in

April 2021, Jack Hutcheson, M.D., added restrictions for hazards and vibration "due to [Joe's]

lumbar disc protrusion at L2-3, disc bulging at L4-5 with stenosis, [and] L2-4 foraminal

narrowing and HTN." R. 118. Otherwise, the physical RFC remained the same. R. 117–18.

On April 21, 2021, Dr. Ostergard wrote a letter discussing Joe's abilities. R. 342 (Exhibit

B1F). He opined that Joe had a "history of chronic low back issues, most recently a far lateral

disc herniation that [was] compressing one of his nerve roots and producing significant radicular

pain and symptoms." *Id.* Joe had "been very careful with activity" and, despite trying to

"advance his activity back to normal range of motion and lifting more than a few pounds, his

symptoms unfortunately recur[red] and bec[a]me very severe again." *Id.* Dr. Ostergard thought

Joe "should continue abstaining from any lifting, bending, or significant rotation of his lumbar

spine to prevent continued worsening of his symptoms." *Id.* He also agreed with "Dr. Roy's prior

assessment that [Joe] was unfortunately not going to be able to continue performing [his previous

job duties] without putting his spinal health at risk." *Id.*

      *3.    Subjective Statements*

      In October 2020, Joe's representative filled an Adult Function Report for Joe. R. 258–67

(Exhibit B2E). When asked about how his conditions limited his ability to work, Joe stated that it

was "most significantly impacted" by his issues with "lifting, bending, standing, reaching[,] and

walking." R. 258. Joe "used to be able to work," "play sports," and "take care of [his] own yard

and vehicles." R. 259. He also "used to hike," "play golf," and "walk 7-9 miles a day while

working." *Id.* Now, Joe woke up "at varying times," and his "daily activities include[d]: taking a

shower, getting dressed, taking medications, preparing a meal, eating a meal, taking a nap,

watching TV/movies, spending time with others in person, [and] talking to others on the phone."

*Id.* He did not care for other people or any animals. *Id.* Joe had to "sit down or lean on

something" while dressing and needed to "sit down to put on socks and shoes." *Id.* It took him

"longer to get dressed than it used to." *Id.* Joe also had trouble "[s]tepping into or out of the

bathtub" and with "washing his lower body." *Id.* He could prepare his own meals, including

"microwaveable meals, sandwiches[,] and soup," and would prepare his meals "[d]aily." R. 260.

It took him one to five minutes to cook. *Id.* Joe "used to prepare more complete meals, but now

prepare[d] simpler meals." *Id.* He had "difficulty lifting pots and pans," and had trouble

"squat[ting] down to get things from cabinets." *Id.* "Standing in the kitchen [was] difficult," and

he was "limited in [his] ability to walk while preparing meals." *Id.* Joe also "relied on others to assist [him] with preparing food." *Id.*

Regarding household chores, Joe was able to straighten up around the house monthly for six to fifteen minutes, do laundry one to two times a week for one to five minutes each time, make the bed daily for one to five minutes, and take out the trash one to two times a week for one to five minutes each time. R. 261. He "ha[d] to take frequent breaks and only d[id] easy things." *Id.* Joe's ability to do laundry was limited to putting clothes in the dryer; his wife "load[ed] the washer and unload[ed] the dryer and fold[ed] everything." *Id.* She also changed the sheets. *Id.* Joe had to use an adjustable bed as well. *Id.* Finally, he "only t[ook] out small light trash bags" and put them "right outside the door." *Id.* Joe left the house "1-3 days per week," and when going out, he traveled by driving a car. *Id.* He was able to go out alone as well. *Id.* Joe reported that "[g]etting in and out of the car [was] difficult" and "[i]t [was] hard for [him] to turn and check for traffic so [he] rel[ied] on [his] mirrors more than [he] used to." R. 262. Joe went shopping in stores for groceries about "once a month," and it took him "under 5 minutes." *Id.* He was "limited in [his] ability to walk through the store" and "ha[d] difficulty lifting groceries and bags of groceries." *Id.* "Standing in the store [was] difficult for [him]." *Id.* When asked about his hobbies and interests, Joe stated that he watched television and movies "daily" and had to "change positions frequently when sitting." *Id.* Regarding his social activities, Joe reported spending time "with others in person" and "on the phone" daily. R. 263. He did "not participate in social activities on a regular basis." *Id.*

In March 2021, Joe submitted another report describing how his conditions limited his ability to work. R. 296. He stated that "[a]s a mail carrier, [he] had to do a lot of walking while carrying a bag with mail as well as constant climbing in and out of [his] truck." *Id.* "[His]

conditions caus[ed] [him] to be unable to do this now as [he] [could] not manage to maintain

being on [his] feet or do[ing] a lot of lifting and bending," and he could not "sit in one position

for more than an hour at a time." *Id.* His daily activities, social activities, and personal care

limitations remained like his previous function report. *See* R. 297–99.

On October 6, 2021, Joe testified at an administrative hearing. R. 48–78. He became

unable to work in December 2017 "due to severe low back pain from degenerative disk disease[]

[and] numerous incapacitations from [a] ruptured disk." R. 52. Dr. Roy took him "out of work

because of the severe limitations of bending, stooping, reaching, turning, [and] twisting." *Id.* Joe

reported that his pain was in the "lower lumbar area" and generated "down the butt" "a burning

sensation that [went] down the back of [his] leg to [his] feet. It [was] a severe pain that

continue[d] and radiate[d]." R. 52–53. He also had numbness in his feet from the back pain. R.

53. Regarding treatment he received for his back pain, Joe has had "three epidural injections,"

but "ha[d] not been deemed a candidate for surgery for [his] back" because "it would not fix" the

problem. *Id.* "Most recently, Kenalog 2 milliliters was given to [him] last August," but because it

did not help, Joe was not given any more pain shots. *Id.* Joe was also prescribed "hydrocodone to

alleviate [his] pain." *Id.* The hydrocodone made him "sleepy and drowsy and it could last for at

least 2 to 3 hours, and usually [he] ha[d] to lay down." R. 54. Joe also said the numbness in his

feet "interfere[d] with [his] ability to walk and move about," causing "balance issues." R. 56.

When asked how long he thought he could sit in an upright position, Joe stated he could

likely sit no longer than fifteen minutes, but ten minutes "right now" and he was "constantly

switching positions." *Id.* After he would sit for about fifteen minutes upright, Joe would "need to

get up." R. 57. Sometimes he iced his back because standing and walking created "pressure on

[his] back from the burning." *Id.* When Joe changed from a seated to standing position, he would

13

have to "push off," and could not "just raise straight up." R. 58. Joe could stand without pain for

fifteen minutes "max." *Id.* He could not lift anything from floor level because he was "not

supposed to bend or stoop." R. 59. Generally, lifting "a few pounds at the most [was] all [he]

c[ould] do." *Id.* Joe's pain also interfered with his sleep, as he would constantly wake up with

"pressure in [his] back" and he could not feel his feet. R. 59–60. Joe said it was "hard to focus

anyway with the pain." *Id.* His back pain affected his personal life, his social life, and his ability

to do chores around the house. *See* R. 62–63. Joe stated that his symptoms "ha[d] worsened"

since the prior ALJ decision; specifically, the pain in his back. R. 68.

B.      *The ALJ's Decision*

ALJ Rippel summarized some of this evidence in his written decision. *See* R. 29–37.

First, ALJ Rippel discussed in detail Joe's subjective statements, including both his written

statements and his testimony and the administrative hearing, R. 32.

Next, ALJ Rippel summarized some of the objective medical evidence from the record.

*See* R. 32–34. While he noted that the record established that Joe had a "history of lumbar DDD

and spondylosis with disc bulging with mild stenosis and facet arthropathy, left leg lumbar

radiculopathy, bilateral hearing loss, and inguinal hernia," R. 32 (citing Ex. B1A, R. 344–36, R.

350–69, Ex. B2F–B3F, R. 370–74, R. 377–78, 403–17, 441–50, 557–74), ALJ Rippel also found

that "the findings on exam were minimal during the period at issue." R. 33. ALJ Rippel

explained that "[p]hysical exams occasionally showed tenderness to palpation across the lumbar

spine with pain-limited range of motion, trigger point over the left sacroiliac joint, and

tenderness to the left inguinal/spermatic cord area, with left scrotal area pain, but he had

otherwise normal findings on neck, chest/lung, cardiovascular, abdominal/gastrointestinal,

musculoskeletal, extremity, and skin exams, and he was neurologically intact without an

assistive device." R. 33. "Lumbar MRIs revealed extraforaminal disc herniation . . . and some

bilateral lateral recess stenosis . . . but no clinically significant neural foraminal or central canal

stenosis." *Id.* (citing R. 478, 501, 677–78). ALJ Rippel also noted that Joe was "prescribed

medications, advised to diet and exercise, and received injections, which he tolerated well and

without complications, and with improvement of his symptoms." *Id.* (citing R. 376, 380–88, Ex.

B6F, R. 418–31, 433–41, 451–54, Exs. B9F–B11F, R. 536–56, 575, Exs. B14F–B19F, B21F,

B23F–B26F).

As a part of his RFC analysis, ALJ Rippel found that while Joe's "medically

determinable impairments [spine impairment, left lumbar radiculopathy, and inguinal hernia]

could reasonably be expected to cause the alleged symptoms," his "statements concerning the

intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent

with the medical evidence and other evidence in the record for the reasons explained" elsewhere

in ALJ Rippel's decision. R. 32. First, ALJ Rippel found that Joe's treatment was "routine,

conservative, and unremarkable, as no surgery ha[d] been required, and he ha[d] not required any

emergency room treatment or hospitalizations for his severe impairments." R. 33 (citing R. 326).

Joe's treatment of medication and other modalities were also "relatively effective in controlling

his symptoms." *Id.* Joe also "ha[d] not alleged any side effects from the use of medications." *Id.*

(citing R. 266, 305, 310). Additionally, there was "no ongoing or significant treatment by an

endocrinology, orthopedic, pain management, gastroenterology, cardiology, rheumatology,

pulmonary, or mental health specialist." R. 34. ALJ Rippel also noted "repeated examinations

only noted periodic findings . . . but ha[d] otherwise failed to reveal significant ongoing

psychological, respiratory, or cardiac signs, or significant neurological deficits or decreased

strength or range of motion, as would be expected with the degree of limitation alleged." *Id.*

While some evidence reflected abnormalities, "other parts could show negative findings pertaining to other systems, and should be acknowledged to reflect that the entire record ha[d] been reviewed with consideration of [Joe's] allegations and objective findings." *Id.* (citing R. 344, 350, 366–67, 457–61, 478, 501, 505–06, 622, 677–78, 682).

The ALJ also found that Joe "acted inconsistently for one who [was] asserting he [was] completely disabled, and he . . . made inconsistent statements or statements contradicted by other evidence of record, which undermine[d] the persuasiveness of his allegations of total debility." *Id.* ALJ Rippel noted some examples, including that Joe reported on November 20, 2019, that he recently waxed his car, *id.* (citing R. 418), and he slept on average 8 hours per night despite claiming difficulty falling and staying asleep, *id.* (citing R. 259, 542). He also found that Joe's daily activities were "not as limiting as would be expected given the complaints of disabling symptoms and functional limitations." *Id.* In support, ALJ Rippel cited Joe's March 2021 Function Report in which Joe indicated he could "prepare simple meals, take his own medications, straighten up around the house, clean laundry, make the bed, take out trash, go outside and go out alone, drive, shop, manage money, and spend time with others." *Id.* (citing Ex. B8E). *But see* R. 32 (summarizing Joe's description of his daily activities and functional limitations). Finally, ALJ Rippel discussed Joe's treatment, finding that he had "not been entirely compliant in using prescribed medications, or in following prescribed treatment." *Id.*

ALJ Rippel then evaluated the medical-opinion evidence in Joe's record. *See* R. 35–37. He found Dr. Roy's opinion "minimally persuasive," because while his opinion was "somewhat supported by his examinations, which reflected findings of pain-limited lumbar range of motion," Joe's condition was "otherwise stable." R. 36 (citing R. 405, 409, 413, 420, 430). "His initial opinion provided no vocationally-relevant limitations and was issued prior to the period at

issue." *Id.* "Further, his subsequent opinion was a checkbox form with no documentary rational

to support his excessive limitations, which appear[ed] to have been based more on the subjective

report of symptoms and limitations provided by the claimant, rather than objective findings in

the record." *Id.*; *see* R. 105–06. He also found Dr. Ostergard's opinions "minimally persuasive"

because Dr. Ostergard's restrictions "were for unspecified periods of time, with no significant

vocationally-specific restrictions, but rather only vague limitations, which ha[d] been

accommodated for in the residual functional capacity for this decision." *Id.* ALJ Rippel noted

that during a December 2020 visit, Joe reported that "he had not had any re-exacerbations of his

low back or left lower extremity pain, and 'overall, it ha[d] been improving with no new

complaints,' with an exam noting improved left proximal L2-L3 distribution numbness, and 5/5

strength in all extremities." *Id.* (citing R. 585–86). He emphasized that "[Joe] also had a

completely normal exam during an April 1, 2021 visit," *id.* (citing R. 640–42), and reported

improvement during a visit in July 2021, *id.* (citing R. 668–69).

Regarding the assessments of the DDS physicians that Joe could perform light work with

some restrictions, ALJ Rippel found both the initial and reconsideration decisions to be "partially

persuasive." R. 37. Dr. Hutcheson's "later findings and opinions [were] most consistent with and

best supported by the objective evidence of record under their review, including findings of pain

and decreased range of motion in the lumbar spine, sacroiliac joint inflammation, and inguinal

hernia pain at times." *Id.* (citing Exs. B1F–B23F). "However, they did not have access to later

evidence requiring additional limitations, including an audiogram demonstrating bilateral hearing

loss." *Id.* (citing R. 46–78, 647–82). Ultimately, ALJ Rippel found the DDS opinions "balanced

and objective, persuasive, and support[ed] the residual functional capacity outlined in th[e]

opinion." *Id.* ALJ Rippel did account for additional limitations "by further limiting [Joe] to a

light exertion with additional and/or more restrictive exertional, postural, manipulative, and environmental limitations, based on a review of all of the evidence of record." *Id.*

C.    *Discussion*

Joe challenges ALJ Rippel's physical RFC findings. A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015).

"[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). "The second component, the ALJ's logical explanation" of how he weighed relevant evidence, such as medical opinions, and arrived at his RFC findings, "is just as important as the other two." *Id.* "This requires the ALJ to 'present [the court] with findings and determinations sufficiently articulated to permit meaningful judicial review.'" *Testamark*, 726 F. App'x at 399 (quoting *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). When the court is "'left to guess' as to how the ALJ reached his evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of her conclusions," *id.* (quoting *Mascio*, 780 F.3d at 638), to ensure "the ALJ's decision is supported as a matter of fact and law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). *See, e.g.*, *Arakas v. Comm'r, Soc. Sec.*

*Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) ("[E]ven under this deferential standard, we do not reflexively rubber-stamp an ALJ's findings. To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." (cleaned up)). Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and his decision built an "accurate and logical bridge from that evidence of [his] conclusion[s]," *Woods v. Berryhill*, 886 F.3d 686, 694 (4th Cir. 2018). *See Thomas*, 916 F.3d at 311–12.

### 1. *Medical Opinions*

Joe asserts that ALJ Rippel's assessment of his physical impairments and RFC findings are not supported by substantial evidence. First, he argues that the ALJ did not properly consider the medical opinions of Dr. Roy and Dr. Ostergard. Pl.'s Br. 17–22. Medical opinions—i.e., "statement[s] from a medical source about what [the claimant] can still do despite" his MDIs and whether he has "impairment-related limitations or restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R. § 404.1513(a)(2), can be critical to a proper RFC analysis. *See, e.g.*, *Woods*, 886 F.3d at 695. For DIB claims filed after March 27, 2017, ALJs must "articulate in [the] . . . decision how persuasive [they] find all of the medical opinions" in the claimant's record to be, 20 C.F.R. § 404.1520c(b), using the relevant factors listed in the regulations, "as appropriate," *id.* § 404.1520c(a).

"[S]upportability and consistency are the most important factors [ALJs] consider when [they] determine how persuasive [they find] a medical source's medical opinion . . . to be." 20 C.F.R. § 404.1520c(b)(2) (cleaned up). ALJs therefore "will explain how [they] considered" those two factors when evaluating a medical source's medical opinion. *Id.* "Supportability" looks

at the "objective medical evidence and supporting explanations presented by a medical source . .

. to support his or her [own] medical opinion(s)[.]" *See id.* § 404.1520c(c)(1). The "more

relevant" the evidence and explanations "presented by a medical source are to support his or her

medical opinion(s), the more persuasive" those opinions will be. *Id.* "Consistency," on the other

hand, compares the medical opinion to other relevant evidence in the claimant's record. *See id.* §

404.1520c(c)(2). "The more consistent a medical opinion(s) . . . is with the evidence from other

medical sources and nonmedical sources in the [record], the more persuasive the medical

opinion(s) . . . will be." *Id.* ALJs "may, but [generally] are not required to, explain how [they]

considered" other regulatory factors, *id.*, such as the source's medical specialty, familiarity with

the record, or treating relationship with the claimant. *See id.* § 404.1520c(b)(3).

        This regulation is more flexible than its prior version, which required ALJs to evaluate

"treating source" medical opinions under a special standard and to explicitly consider each of

five regulatory factors when assigning specific weights to every medical opinion in the

claimant's record. *See, e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir.

2021) (citing 20 C.F.R. § 404.1527(c) (2016)); *Testamark*, 736 F. App'x at 398 (citing 20 C.F.R.

§ 404.1527(c) (2016)); 20 C.F.R. § 404.1520c(a) (2017) ("We will not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those

from your medical sources."). Even under the new regulation, an ALJ "cannot reject an

examining or treating [source's] opinion as unsupported or inconsistent without providing an

explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir.

2022).

        ALJ Rippel's decision does not satisfy this "deferential standard of review." *Dunn v.

Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015). First, regarding Dr. Roy's medical opinion and

20

Dr. Ostergard's medical opinion, ALJ Rippel fails to mention either the "consistency" or "supportability" factors at all as required by the regulations. Thus, the ALJ failed to "articulate *how* [he] considered the supportability and consistency factors." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (emphasis added) ("*Revisions to Rules*"). Second, ALJ Rippel did not build an accurate and logical bridge from the evidence to his conclusion that Dr. Roy's opinions were "minimally persuasive." R. 36; *see Arakas*, 983 F.3d at 95. ALJ Rippel points to certain evidence to support his conclusion, but he does not provide any explanation as to *why* this evidence supports his conclusion about Dr. Roy's medical opinion. *See* R. 36. The same goes for Dr. Ostergard's opinion. Again, while ALJ Rippel cites specific evidence and concludes that Dr. Ostergard's opinion was "minimally persuasive," he fails to explain why the evidence supports his conclusion. This failure to explain is reversible legal error. *See Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *1 (E.D. Mich. Aug. 13, 2021); *cf. Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 661 (4th Cir. 2017) (concluding that a regulation which "states the SSA *will* document application of the [special] technique in the decision" imposed mandatory duty of written explanation in evaluating mental impairments and explaining that an ALJ's "failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review"); *Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016) (ALJ's conclusory statement that "the objective evidence of the claimant's treatment history did not support the consultative examiner's findings," without specific citations to the record, precluded meaningful review).

Joe also argues that ALJ Rippel cherrypicked certain evidence and "ignore[d] significant evidence contrary to his findings." Pl.'s Br. 20. An "ALJ has the obligation to consider all

relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869. Particularly in his assessment of Dr. Ostergard's medical opinion, ALJ Rippel focused on a few office visits where Joe's lower back pain had been improving and his exams were "normal." *See* R. 36 (citing R. 585–86, 640–42, 668–69). ALJ Rippel did not discuss many other office visits where Joe's lower back pain had worsened, and Dr. Ostergard even recommended surgical intervention. *See, e.g.*, R. 668, 670. Notably, in the July 2021 exam where Joe showed improvement, Dr. Ostergard still opined that Joe would not be able to return to work because of his back pain. R. 670. The medical records show that Joe's back pain was a constant struggle, with periods of worsening and periods of improvement. Thus, ALJ Rippel cherrypicked certain evidence while overlooking other evidence that could support a finding of disability. This is also reversible legal error. *See Lewis*, 858 F.3d at 869.

Finally, ALJ Rippel's characterization of the substance of both doctors' opinions does not entirely hold up. He found that Dr. Roy's "initial opinion provided no vocationally-relevant limitations" and "his subsequent opinion was a checkbox form with no documentary rational to support his excessive limitations, which appear to have been based more on the subjective report of symptoms and limitations provided by the claimant, rather than objective findings in the record." R. 36. Dr. Roy's initial opinion specified that Joe had "severe limitations with lifting and bending," R. 346, but the opinion did not further describe the extent of the limitations, *see id*. Although Dr. Roy's checkbox opinion did not cite the medical records, Dr. Roy identified Joe's diagnosis as lumbar spondylosis. R. 390. Dr. Roy's treatment records documented his findings that Joe had "severe limitation in lifting abilities," R. 420, "significant degenerative change" in his lumbar spine, R. 383, and his symptoms improved when he was not working, R. 385. The

22

ALJ did not explain why those findings did not support Dr. Roy's opinion, and he did not

explain the basis for his determination that Dr. Roy's opinion was based on Joe's subjective

report of symptoms.

ALJ Rippel characterizes Dr. Ostergard's restrictions as "vague." R. 36. Dr. Ostergard

opined that Joe "should continue abstaining from any lifting, bending, or significant rotation of

his lumbar spine to prevent continued worsening of his symptoms." R. 342. Dr. Ostergard's use

of the term "abstain" provides a reasonably clear assessment that Joe should not lift, bend, or

rotate his spine. The ALJ did not explain why these limitations were "vague." Moreover, the ALJ

did not explain how he "accommodated," R. 36, the limitations in the RFC. The lack of an

adequate explanation undermines the ALJ's assessment of the medical opinions.

### 2. Joe's Symptoms

Joe also challenges the ALJ's assessment of his symptoms. Pl.'s Br. 23. The regulations

set out a two-step process for evaluating claimants' symptoms. *Lewis*, 858 F.3d at 865–66; 20

C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that

could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and

degree[] alleged by the claimant," *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second,

assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and

limiting effects of the claimant's symptoms to determine the extent to which they limit the

claimant's ability," *Lewis* 858 F.3d at 866, to work on a regular and continuing basis, *Mascio*,

780 F.3d at 637; *Hines*, 453 F.3d at 565. "The second step requires the ALJ to assess the

credibility of [subjective] statements about symptoms and their functional effects," *Lewis* 858

F.3d at 866, after considering all relevant evidence in the record, 20 C.F.R. § 404.1529(c). An

ALJ evaluating a claimant's RFC has broad discretion to decide whether an alleged symptom or

limitation is supported by or consistent with other relevant evidence in a claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:12cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's credibility determination if his or her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66. ALJ Rippel's decision does not meet the second requirement.

First, ALJ Rippel found Joe's statements to be "inconsistent because [Joe's] treatment record d[id] not support his allegations regarding the severity of his limitations." R. 33. ALJ Rippel stated that Joe's treatment was "routine, conservative, and unremarkable, as no surgery ha[d] been required, and he ha[d] not required any emergency room treatment or hospitalizations for his severe impairments." *Id.* (citing R. 326). "In addition, [Joe] had been treated with medications and other modalities, which ha[d] been relatively effective in controlling his symptoms." *Id.* Regarding Joe's treatment being "routine" and "conservative," while Joe never had surgical intervention for his back pain, ALJ Rippel did not acknowledge in his analysis that Dr. Ostergard recommended surgical intervention at various times due to the severity of Joe's back and hip pain. R. 478, 668, 670; *see Lewis*, 858 F.3d at 869 ("ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding."). Additionally, while Hydrocodone, ibuprofen, and some at-home care treatment helped alleviate some of Joe's back

pain, leg pain, headaches, and hernia pain, ALJ Rippel did not discuss Joe's fluctuating symptoms that waxed and waned throughout his various appointments and improved some because he was not working. In fact, Dr. Roy noted that Joe's symptoms only seemed to be "slowly" improving with hydrocodone, R. 418, and at future appointments, Joe's back pain appeared to have worsened, *see, e.g.*, R. 500.

Next, ALJ Rippel found that Joe was "not entirely compliant in using prescribed medications, or in following prescribed treatment, which suggests that the symptoms may not have been as limiting" as he alleged. R. 34. ALJ Rippel specifically highlights that Joe did not seek out mental health treatment for his depression, but there is no apparent correlation between Joe's depression treatment (or lack thereof) and his statements regarding his abilities to sit, stand, walk, and lift because of his lower back pain. *See Mascio*, 780 F.3d at 639 ("The first reason has nothing to do with pain."). Thus, the ALJ did not build a logical bridge between the evidence and conclusion. *See Woods*, 888 F.3d at 694. ALJ Rippel also stated that Joe was not receiving treatment of his hernia and if he "were truly suffering to the extent alleged, one would expect a follow through with treatment and taking medications regularly." R. 35. He did not explain, however, why Joe's lack of hernia treatment undermined his report of symptoms and limitations from back pain.

ALJ Rippel also noted that "[d]espite alleging significant functional limitations, repeated physical examinations noted only periodic findings . . . but have otherwise failed to reveal significant ongoing psychological, respiratory, or cardiac signs, or significant neurological deficits or decreased strength or range of motion, as would be expected with the degree of limitations alleged." R. 34. Furthermore, "[t]here ha[d] been no ongoing or significant treatment by an endocrinology, orthopedic, pain management, gastroenterology, cardiology, rheumatology,

pulmonary, or mental health specialist." *Id.* Joe's physicians treated him with pain medications, and Dr. Ostergard recommended spine surgery. The ALJ did not explain why Joe's not receiving pain management, which his doctors did not recommend for his back problem, is significant. Furthermore, the ALJ does not explain how the fact that Joe did not seek treatment for other health issues or systems undermines his subjective statements regarding his back pain, nor did he explain how this supports or explains his ultimate RFC. Again, he did not build a logical bridge between the evidence and conclusion. *See Woods*, 888 F.3d at 695; *Mascio*, 780 F.3d at 639.

Finally, ALJ Rippel found that Joe "acted inconsistently for one who [was] asserting he [was] completely disabled, and he ha[d] made inconsistent statements or statements contradicted by other evidence of the record, which undermines the persuasiveness of his allegations of total debility." R. 34. He pointed out that Joe reported to his neurologist that he had waxed his car, which the ALJ found undermined Joe's allegations that he was limited in his abilities to "lift, squat, bend, stand, reach, walk, kneel, complete tsks, and use his hands." *Id.* The ALJ's conclusion about this one activity is not supported by the actual treatment record. Joe reported that he waxed his car, and that activity caused low back pain. R. 418. Thus, this example provided by the ALJ does not support his assessment of Joe's symptoms.

ALJ Rippel also found that Joe's description of his daily activities was "not as limiting as would be expected given the complaints of disabling symptoms and functional limitations," and pointed out that Joe could "prepare simple meals, take his own medications, straighten up around the house, clean laundry, make the bed, take out the trash, go outside and go out alone, drive, shop, manage money, and spend time with others." R. 34 (citing R. 295–305). However, "the ALJ did not acknowledge the limited extent of those activities as described by [Joe] or explain how those activities showed that [Joe] could sustain a full-time job" outside the home. *Brown v.*,

873 F.3d at 251. While ALJ Rippel noted Joe's limitations regarding his daily activities in the summary of his testimony and function reports, *see* R. 32, he did not consider the extent to which Joe could perform said activities in his analysis, *see* R. 34. In evaluating a claimant's activities of daily living, "[a]n ALJ may not consider the *type* of activities a claimant can perform without considered the *extent* to which []he can perform them. The ALJ here did just that." *Woods*, 888 F.3d at 694. Accordingly, the ALJ's analysis of Joe's reported activities of daily living does not support the ALJ's decision to discredit his report of symptoms and limitations.

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 17; **REVERSE** the Commissioner's final decision denying Joe's DIB claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 22, 2023

Joel C. Hoppe
United States Magistrate Judge